Thank you, Honors. It's a pleasure for me to be here before you today. I am representing Wendy Howell in the Social Security Disability Claim. Wendy Howell had two herniated discs and surgeries for both of those. I would like to discuss today, answer any questions you have, and discuss what I feel are some significant errors of the ALJ that were not harmless errors and that require either an award of benefits or a remand for further proceedings in this rebuttal. I guess the first thing I'd like to point out is in the record at 22, it's the ALJ's second decision in this case. He says that there was no specific work-related limitations, and this is the second sentence of the last paragraph. Neither were specific work-related limitations assessed, which are more restrictive than those established in this decision. In other words, what the ALJ is saying is that he found that she could do the full range of sedentary work, that there were no non-exertional limitations. That's what he found. And he goes forward with the point that there's nothing even assessed in the record that shows that she has any non-exertional limitations. She can do the full range of sedentary work. Not only can she do it, not only am I not rejecting these opinions, but there are no such opinions in the record, and none have been assessed. This was a very significant reversible error, because the judge went on to say that he found that the DDS State agency physicians, the ones that Social Security hires to review the files, the non-examining physicians are experts in giving disability opinions. The DDS examiners gave these following non-exertional limitations, that the claimant was occasional they could only occasionally stoop, kneel, crouch and crawl, that's found at 454, that also that she could not see it was limited reaching in all directions. That's at 455. That's from the State examiner who the judge said was an expert and who never rejected those opinions. If we accept those opinions, if we say the judge did not direct, did not properly discredit those opinions, they are credited as a matter of law. The vocational expert at the hearing testified that her past job all required frequent reaching in all directions. Well, what time period are we supposed to attach those limitations to? These limitations were limitations that the DDS physician the reaching limitations were the DDS limitation he said was on or before the date last insured at 454. So before March of 2000. Now, there's an interesting issue that's a little bit more complex, I think, here than what the district court thought about when they made the statement, well, it may well be that when she had her second surgery and her second herniated disc, she is disabled, but that's after her date last insured. One of the problems that we have, the judge said that on March of 2000, her date last insured, that she was not disabled on that date. Well, that was just two months before her first surgery. She was having significant problems on that date. It was confirmed by many physicians that she was disabled and couldn't work on that date and had been since 1998. Now, if she's she should have been granted at least a closed period before her first surgery, granted because there was approximately about a six-month period of time when she was symptom-free. If she had been granted her closed period from 1998 to 2000, as the evidence suggests, there would be a disability freeze. Her date last insured would no longer be March of 2000. It would be moved out into later into 2002, well past the period of her second herniated disc, and she'd be eligible again then for benefits. Because the time you're on disability, then you get that disability freeze to extend your date last insured, which is an important issue, I think, in this case. The non-exertional limitations were not limited just to the DDS physicians. Dr. Linder, who was called at the hearing by the judge as the judge's own medical expert, stated at 597 that during this period of her prior to her date last insured, she should do no overhead work and that she should have no repetitive bending, stooping, and twisting. That's at 597 in the transcript. Dr. Linder. The judge did not reject Dr. Linder's opinion. That is reversible error. Dr. Ider, back in 1998, said that Dr. Ider. Dr. Ider. Counsel, if we were to agree with you, procedurally, do we send it back to ALJ or do we reverse and grant benefits? Dr. Linder. I believe the proper remedy is to reverse and grant benefits because in Leicester, the case law says that if an ALJ does not properly discredit the treating physician or that other physicians examine a physician's opinions, they are credited as a matter of law. In this case, Dr. Brandt had said that she would miss four or more days of work, that she needed to lay down significantly during the day. Dr. Ider said that she needed to pace herself and take rest periods throughout the day. If she didn't, her pain would dramatically increase. She'd have to take increased medications. Dr. Ider is the board-certified rheumatologist who diagnosed her with the fibromyalgia. So if we credit any of those, then she should be found disabled. And the vocational expert testified at the hearing that if she had to lay down, if she missed work, that she would be found disabled. She could not do any SGA work, is what the vocational expert testified at the hearing. Kennedy. But doesn't it – wouldn't it be up to this Court to make a determination that if there was a disability with an expectation of 12 months or whatever the attendant requirements would be beyond advising the immigration judge that he ought to pay attention to the treating physicians? Yes. In order to pay benefits, there would have to be a 12-month period of disability. And the record is well-developed that there was a 12-month period of disability from 1998 up and through past her first surgery. Dr. Brandt had made a mistake on one of his forms and said she had surgery in March of 2000. The surgical reports in the record, it was May 7th of 2000 when she had her first surgery, not May. The neurosurgeon, Dr. Thomas, said he removed the collar from her neck in July of 2000. Now, there was a period of time from that period, July of 2000, until January of 2001, when she was relatively symptom-free. Granted, she wasn't doing anything. She did have – in 2001, tried to go back to work, but that job only lasted a month because her symptoms flared back up again. Which Dr. Eider had said all along back in 1998 that she needs rest periods that aren't accommodated in the workplace. If she has a work to go to, her pain is going to increase. That's exactly what happened in 2001. She got a new MRI, showed bulging disc, and then a large herniated disc at the level just below where she had the prior surgery. So there's this six-month period between July of 2000 and January 2001 where she was relatively symptom-free. And she was grateful. She says, oh, great, I don't have fibromyalgia. She was happy about it. She wanted to have something real, something tangible, you know, that she could put her foot into, but it turned out that it wasn't. And Dr. Brandt clarified that in 2003, when he was able to look back at all of this. Yes, she did have two serious herniated discs. Yes, she did have two cervical surgeries. But she also had fibromyalgia. And the judge found she had fibromyalgia. I don't know why the government's fighting that now. I mean, that was a finding that the ALJ himself made, that she had it. His medical expert, Dr. Linder, at the hearing afterwards said she had fibromyalgia also. Ginsburg. Do you want to save some time? I would like to. Thank you, Your Honor. Thank you. Good morning, Your Honors. I am Tom Mills-Bragg for the Social Security Administration. I think I would like first to address counsel's representation, or arguments regarding the DDS physician's opinions, and Dr. Linder, and to make note that neither of those issues were raised below. They were raised for the first time on appeal. The Judge Imbrogno noted in her opinion the specific issues that were argued below, and those involved the two treating physicians, Dr. Ider and Dr. Brandt. These are the testimony and issue of Step 4. At no point is there any mention or any reference to the issues that counsel just argued. That said, the ALJ ---- Which particular issue? Pardon me? The issues of the DDS physicians and the assessment of those opinions by the ALJ and Dr. Linder's opinion. That said, the DDS physician's opinion was noted by the ALJ in the first hearing, or the first decision. And while not the picture of clarity, he specifically stated while they found she was capable of light work, the DDS physician's found her capable of light work, he would limit that to sedentary work, giving her the time for the doubt. But it was to the full range. That said ---- I'm not sure which physicians is it you're saying there was no exception taken to? Which testimony as to which physicians? Which physicians were addressed below or that I'm taking exception to? The ones you're taking exception to. The DDS physicians discussed by ---- Actually, it's one physician that's, I believe, Dr. Rodkey. That is at the excerpts at ---- which I don't have that readily available. But the ALJ's discussion of that, the DDS physician's opinion, was at exception record 283. I may not have heard it correctly. My understanding of the argument the Claimant Counsel makes is that the DDS physician, at least at some point in his or her report, supported, gave an indication, made a statement that supported the argument of disability. Is there anything to prevent us from considering that, if that's correct? I would argue that the appellant's failure to raise that below would preclude, should preclude consideration. So does the Claimant Counsel, is it, are they required as a matter of law to, in their appeal, to point to evidence that supports the disability claim as opposed to assigning error? I believe so. What's your authority for that? Well, I think, first and foremost, the regulation is where it is the claimant's to prove disability. And to do that, she needs to present evidence that it establishes limitations that are to a disabling level. Does that mean we're prevented from looking to the record for those things that might help us in making the determination of whether the ALJ's decision is supported by substantial evidence? No, absolutely not. I would limit the, the limitation of review to appellant's argument. I would, I would not argue that you are limited from reviewing the record at all. In fact, I would, I would think that that is part of your duty as well, to ensure that the ALJ's decision is supported by substantial evidence. Let's talk about something that's specifically, I think, is raised. Did the ALJ reject Dr. Brandt's second report? Yes, he did. And what was the basis for doing that? He, he, actually, the second report, and let me clarify, what he rejected was Dr. Brandt's disability opinion within that second report. And the basis for it was the inconsistency, first and foremost, the inconsistency between Dr. Brandt's two opinions. In his 19- Well, he said more than inconsistency. He said that the second report contradicted the first, didn't he? In fact, it did, because the second report says that she's been disabled since March 16th, 1999, the day he started treating her. The first opinion by, disability opinion by Dr. Brandt said that she was disabled prior to March 1999, but thereafter was symptom-free. Those two opinions are inconsistent. She's either been disabled since March through to the March 1999 through 2003, or she's only been disabled up to March 1999 and not thereafter. So the opinions are inconsistent. Doesn't there seem to have been some misconstruction of what Dr. Brandt said or was reported to have said? There were some errors that complicated things on Dr. Brandt's part and on the LJ's part. The LJ's, first off, as counsel mentioned, Dr. Brandt said symptom-free since March. He should have said May. That's when her herniated disc surgery was performed. And the LJ reversed what Dr. Brandt said and said she wasn't disabled and now is disabled. So either interpretation is inconsistent with consistently disabled since 1999 through 2003. Did I, LJ, seem to impute something close to, I don't know whether bad faith, but a lack of credibility to Dr. Brandt? I saw him as almost an advocate, not a physician. And I kind of wondered whether the LJ may have gone a little beyond where he should have given his erroneous understanding of an erroneous. I think the LJ had some concerns. I don't know that he did go beyond. He raised concerns partly because the plaintiff or the appellant, I believe twice, asked him to participate in her disability finding or reporting. But I believe he raised the possibility of advocacy but then did not substantively rely on that. And the essence of his rejection of those disability opinions was the inconsistency of his, within his own opinions, the inconsistency or lack of objective evidence to support opinion of disability. He performed no objective testing. And the inconsistency with other doctors. His 2003 opinions had disabled since 1999 through 2003. But Dr. Thomas, the operating neurosurgeon, specifically said periods, long periods are free. And S did claim it herself with the appellant. She reported that her, in her words, so-called fibromyalgia is completely cured. Discrediting a treating physician isn't the routine, is it? It is not the routine. They're typically given great weight. But they do need to be supported by substantial evidence. It is fairly routine to not give them great weight or even deference when their opinions lack any supporting objective testing, are inconsistent with other treating and or examining physicians. Well, isn't fibromyalgia a condition that is entirely supported by subjective statements? So how could you apply that standard to a condition of fibromyalgia? It's a very good point. Another interesting wrinkle within this case. Yes, it is primarily subjective. There is a degree of objective testing that the American College of Rheumatology suggests, which is to test for the tender points. And it's to test specifically for pain at the tender points, not just tenderness. And to reach a proper diagnosis of fibromyalgia, you should have 11 out of 18, pain at 11 out of 18 tender points. Dr. Idar, the rheumatologist here, never performed any of that testing. There's no evidence of any such testing. And the wrinkle that I refer to is the fact that it did turn out that it was the herniated disc that was at issue, and not the fibromyalgia. It actually seems like it was both. I mean, if you look at the medical records. And I think DLJ's finding that she had fibromyalgia and a herniated disc was to encompass that possibility as well. But nonetheless, even Dr. Idar's examinations showed no limitations. I mean, she did do joint examinations, and nearly all her testing had full range of motion or nearly full range of motion, showed no limitations whatsoever that would be consistent with disability or inability to perform her past relevant work, which is what DLJ's finding was based on. It was the basis for his weighing of Dr. Idar's opinion as well. Despite the diagnosis, it requires more than a diagnosis for fibromyalgia to become disabling. It must also be of such severity as to be disabling. And the subjective evidence from Dr. Idar doesn't support a degree of disabling. Now, her testimony was routinely would be accorded a great deal of weight, would it not? It would. In treating rheumatologists? Again, it would. But DLJ considered it and noted that it was not supported by objective. And she, in fact, did not perform the tests that a rheumatologist, that the American College of Rheumatology suggests one perform. Moreover, I would like to, if I may move on to one point before my time expires. As Judge Imbrogno noted, despite the, any errors with the Step 4 finding, which I would assert there are no harmful errors, the informal Step 5 finding that DLJ referenced at the end of his statement, while not a perfect Step 5 finding, would be no more than a harmful error under stout because, A, was that a step that was not required, assuming Step 4 was done properly, and, B, even if it was required because Step 4 wasn't proper, if he had gone to the medical vocational guidelines with a full range of sedentary for an individual such as the appellant, 31 to 33 years old, with a full range of sedentary work, there's not a single area that directs the finding of disabled. All categories assess not disabled or would direct DLJ to find not disabled. Thus, although his Step 5 finding was quite informal, nonetheless, had he done it properly, the medical vocational guidelines direct only a finding of not disabled. All right. Thank you, counsel. We don't believe the argument regarding the DDS was waived at all. It was part of our Step 4 argument. Step 4, as we put forth in this Court, we did pages of it, and we also did before the district court, is the Step 4 argument requires three steps, three phases. One is that you find out what were the demands of the past work. Two, that you find what is the appropriate RFC. And just because we put in that section what is the appropriate RFC, and we argued there that the judge did not come up with the appropriate RFC, I don't think we have to lay out a whole separate argument that says DDS was the ALJ was in error for improperly rejecting the DDS doctor's opinion. It's all in the facts. This is no new evidence. There's no surprise to the government. This is stuff that Social Security themselves generated, that the judge considered and said that there was no contrary evidence, but there was. And it's important because the V.E. said all of her work required frequent reaching. And this is a neck impairment with herniated disc. That's the typical complaint, is the reaching and the handling and the fingering. And he limited her sedentary work. And that eliminates sedentary work because sedentary work is clerical in nature for the most part. And so with those combinations, you can see why Dr. Eider, the board-certified rheumatologist who treated her, said, hey, she's not going to succeed in the workplace. She said that many times. And she said it back in 1998. That's her alleged onset date. Dr. Eider did do tender point exams. What was in error was when in the brief of the defendant, they said in their brief in three different places, pages 10, 13, and 25, that MTMs are multiple tender points. And they showed that there were no multiple tender points. This is on exams by Dr. Eider. This is under the heading joint exams. Joint exams for ankle. MTS doesn't stand for multiple tender points. It stands for metatarsophalangeal joints of the ankle. She didn't have any tender point in her ankle. And that was a joint exam for the ankle. Three different times the defendant points that she doesn't have tender points because of that exam. Wrong exam, wrong part of the body. That's a joint, not a muscle. Fibromyalgia is arthritis of the muscles and the tender points. The district court said that because one doctor that we don't know who it is, this initials are AR, said that she didn't have any trigger points, that means she didn't have fibromyalgia. Trigger points are different than tender points. So we supplied the article from the health, the authoritative article in the health department that indicated that trigger points and tender points are different. Trigger points aren't used to diagnose fibromyalgia. Tender points aren't. All right. Thank you very much, counsel. Health versus ASTU will be submitted.
judges: Hawkins, Wardlaw, Pollak